## STRONG v. ROSS.

[No. 4,893.    Filed October 4, 1904.]

PRINCIPAL AND AGENT.—*Contract in Excess of Agent's Authority.*—*Not Binding on Principal.*—Defendant authorized an agent to sell his farm for a certain sum, the first payment to be made on February 1. The agent entered into a contract with the purchaser without the consent of the owner by the terms of which the first payment was not to be made until March 1, and without authority from his principal obligated his principal to furnish an abstract of title, pay taxes after the purchaser took possession, and to credit on the purchase price any insurance the purchaser might receive from the destruction of any buildings on the land before the execution of the deeds. *Held,* that the contract was in excess of the agent's authority and not binding on the principal unless ratified by him. *pp. 590–597.*

SAME.—*Authority of Agent.—Knowledge.—Duty to Ascertain.*—A person dealing with a real estate agent with knowledge that the authority of the agent rests upon correspondence with the principal must ascertain the extent of the agent's authority, and is bound by the restrictions therein. *pp. 597, 598.*

SAME.—*Contract in Excess of Agent's Authority.—Ratification.*—An agent executed a contract for the sale of a farm, in excess of his authority, and sent one copy to his principal requesting that he have his wife sign it, and delivered a copy to the purchaser. The principal held the copy sent him and corresponded with the agent, making objections to the contract and counter proposals, the agent's answers indicating the rejection thereof by the purchaser. The vendor did not communicate with the purchaser, but had reason to believe that the agent and the purchaser were in communication. *Held,* that the failure of the principal to communicate with the purchaser did not amount to a ratification of the contract. *p. 598.*

From Benton Circuit Court; *Joseph M. Rabb,* Judge.

Action by Luther G. Strong against Joseph Ross. From a judgment for defendant, plaintiff appeals. *Affirmed.*

*W. V. Stuart, E. P. Hammond, D. W. Simms, Daniel Fraser* and *W. H. Isham,* for appellant.

*F. B. Everett* and *Thomas Everett,* for appellee.

BLACK, C. J.—The complaint of the appellant Luther G. Strong against the appellee Joseph Ross was based upon

an alleged written contract of sale of certain land in Benton county, as follows: "This agreement, made and entered into this 7th day of August, 1901, by and between Joseph Ross, * * * Ross, his wife, of Los Angeles county, California, party of the first part, Luther G. Strong, party of the second part, witnesseth that the parties of the first part have this day sold to the second party all the following described real estate," etc., describing the land, being "460 acres, more or less, for and in consideration of the sum of $36,800 payable as follows: $1,-000 this day paid, the receipt whereof is hereby acknowledged; and the party of the second part agrees to assume two certain mortgages aggregating $13,000; and the party of the second part, on or before March 1, 1902, to pay $10,000; and the second party on March 1, 1902, to execute his note for the residue of said $36,800, payable in five years from date, with interest at the rate of six per cent. per annum, payable semiannually at some bank in Indiana; and the second party agrees to make, execute, and deliver his mortgage on said real estate to secure the payment of said note and interest. And the first party agrees, upon the payment as above set out, to execute and deliver to the second party a good and sufficient deed of conveyance conveying to him, the said second party, all of said real estate, which deed shall contain full covenants of warranty. And the said first party agrees to furnish an abstract of title to said real estate on or before February 1, 1902, showing a good and merchantable title, excepting said two mortgages of $13,000. And it is especially agreed and understood that in the event the said second party shall fail or refuse to make such payments or execute such note, or violate any of the conditions of this contract, that said $1,000, this day paid, shall be forfeited 'to the first party as liquidated damages. And the party of the first part agrees to pay all taxes on said real estate for the year 1901, payable in May and November 1902.

It is agreed and understood that in the event any of the
buildings now on said real estate shall be destroyed by fire
before the deed hereinbefore mentioned is executed, that
any insurance thereon shall be collected by the said first
party, and shall be by him applied to the payment of the
purchase money herein described, and it shall be credited
to the second party as a part payment of such purchase
price.    Dated this day and year first above written.
Joseph Ross (per W. T. Ross, Agt.).    Luther Strong."

It was alleged in the complaint that the appellant had
complied with the contract on his part, except as prevented,
as thereinafter stated; that the appellee had failed and
refused to comply with its terms and conditions on his
part; that he had failed and refused to furnish the appel-
lant with an abstract of title to the real estate on or before
February 1, 1902, or at any other time, and he still re-
fused to furnish such abstract; that soon after the exe-
cution of the contract the appellee repudiated it, and de-
clared that he would never perform the conditions therein
upon his part.    On the trial, after the introduction of the
evidence, and after the conclusion of the argument of
counsel, the appellant was permitted to amend the com-
plaint by inserting the words, "to wit, on March 1, 1902,"
after the words, "that soon after the execution of said con-
tract" the appellee "repudiated the same."

The complaint further stated, in substance, that the ap-
pellant was unable to find the appellee on March 1, 1902,
for the purpose of making tender and demanding an ab-
stract of title and the execution of the deed; but that on
March 3, 1902, the appellant met the appellee, and then
offered to pay him all money due on the contract on March
1, 1902, and to execute the note and mortgage, and de-
manded of him an abstract of title and the deed of con-
veyance; but that the appellee then again repudiated the
contract, and declared that he would never perform any
of the conditions therein on his part, and waived all for-

Strong v. Ross.

mality as to counting out and making a tender of the money and as to tendering the note and mortgage, for the reason, stated by him, that he would never make a deed under the contract.   There were further allegations of readiness and willingness on the part of the appellant and of his offering to perform, and a statement of the bringing of money into court.   It was shown that the appellee was a man about seventy years of age, married to a second wife, named, by whom he had no children, there being children of his alive by a former marriage; that the appellee still retained to his own use and benefit the $1,000 paid him as aforesaid.   Referring to the uncertainty as to the inchoate interest of the appellee's wife, the appellant asked the court to ascertain the amount for which the appellant's note should be executed, offering to execute such note secured by mortgage, etc.   Prayer, that the appellee be required to receive said sum of $10,000 and to execute a deed of conveyance, etc.; that the court ascertain the value of the inchoate interest of the appellee's wife, to be deducted from the purchase price, and that, after making stated deductions, the appellant be permitted to execute his note for the residue; and for damages in the sum of $10,-000, and for all proper relief; and that upon refusal to make such deed a commissioner be appointed to execute it.

The appellee answered by general denial, and by a second and verified paragraph denying his execution of the written contract in suit, and alleging that he never authorized said W. T. Ross to sign or execute it for him in his name, or as his agent or attorney in fact, or in any mode, and that the appellant never paid the appellee $1,000, or any sum under the alleged contract, and that appellee never received or retained any money from any person upon said contract, and that said W. T. Ross had no authority, written or oral, to sign or in any manner execute said contract for or as agent of the appellee, and that the

appellee had never ratified or recognized or acted under said alleged contract. Afterward the appellee filed his third and fourth paragraphs of answer, the latter under oath, the substantial averments of these paragraphs being, in effect, contained in the second paragraph.

The appellant replied to the second, third, and fourth paragraphs of answer in two paragraphs; the first being a general denial. In the second it was averred that the appellee, August 31, 1901, with full knowledge of the contract, and that W. T. Ross, claiming to act as agent of the appellee, had executed it, ratified the contract, and agreed to comply with its terms, and at the time of said ratification had in his possession a copy of the contract, and was fully acquainted with all the terms and conditions thereof and of all the facts relating thereto.

The cause was tried by the court, the finding and judgment being in favor of the appellee. Upon the trial, the appellant was authorized by the court to remove the money tendered, upon consent of the appellee, which was given in open court.

The appellant has assigned as error the overruling of his motion for a new trial, and has presented for our decision the question as to the sufficiency of the evidence to support the finding. The appellee, at the date of the alleged contract, resided in California, and had not recently seen W. T. Ross, the appellee's nephew, who signed the instrument as agent. The evidence consisted largely of letters and postal cards. February 6, 1901, W. T. Ross wrote from Boswell, Indiana, where he then resided, to the appellee, saying: "I have an inquiry from a land agent at Kentland, Indiana, asking if you were wanting to sell your land in York township. I told him that you did, but could not give him any information as to price. He told me to correspond with you and find out as soon as possible, as he had a buyer. My father has gone to Raub to see Mr. Strong concerning the land. Real estate is having quite a

boom at present in this county, and if you will let me know the best you will take per acre, I will correspond with the agent, and any commission he may charge must be above your price, although we will limit him to not above $1 per acre. Kindly let me know immediately, as the time to strike is when the iron is hot, which is at the present time."

February 14, 1901, the appellee wrote from California to W. T. Ross, saying: "I received your letter yesterday, and contents noted. I did not know that you was in the real estate. You mentioned in your letter of your agent charging $1 per acre. If that is his charge, I don't want to engage him, as Wadsworth, of Fowler, will take it for fifty cents per acre. If you will take it at that and give me the privilege of selling it myself or other agents that I may wish to give it to, and if they sell it you don't get your fee,—I don't want to pay two fees. If these terms suit him, he may go on; if not, no harm done. I am holding it at $40,000, the one-third down and the balance to suit purchaser, to be secured on the place at six per cent. There is 460 acres in it, all well tilled, and as good land as there is in the county." On the same day—February 14, 1901—the appellee wrote from California to the appellant, who was occupying the land as tenant, saying: "I have made up my mind to sell my place, as I want to have all my property near me, so that I can attend to it myself; and as I promised to give you the first chance, if you want to buy, there is another party has wrote me about it, so, to make my word good, I write to you to give you the first chance. I am holding the farm at $40,000, the one-third down, and the balance to suit purchaser, to be secured on the place at six per cent. If those terms suit you, let me know by return mail, as I want to let the other party know. When I left you I intended to see you again, but on account of sickness of my wife I was unable to get back again. We just got back about three weeks ago." The appellant answered this letter saying that he did not want

to pay over $75 an acre.    There was no subsequent communication between the parties.

May 6, 1901, the appellee wrote from California to his brother James Ross, the father of W. T. Ross—James being the appellee's agent in Indiana for renting the land —saying:    "Your letter and statement came to hand in due time.    I was corresponding with a man at Watseka. He was wanting to buy my place.    I put the price down to $80, for I had some notion of going into the wholesale of the hay and feed business in Los Angeles, and I wanted to raise $10,000 to put into it.    So I thought I would see what I could do with him before I would make any improvements on the place; but he has not come to my terms yet.    He made me an offer, but did not quite come to my price, so I think I will wait a while and see if I don't sell.    What wants fixing the most?    The house or the cribs?    And let me know what it is going to cost.    You can tell Will the price that I have put on the place."

June 17, 1904, W. T. Ross wrote from Boswell, Indiana, to the appellee, saying:    "I have advertised your farm.    Have had several inquiries about it.    Let me know how you want the payments made, if I should sell it; also if it is incumbered or not, and any other information, so that I can make an intelligent explanation of all matters pertaining to it."    To this the appellee replied from California, June 25, 1901, saying:    "Yours of the 17th is at hand and contents noted.    There is an incumbrance of $13,000 on the place, '$6,000 of it is due next February 1st, and the balance due one year from that date, but can run longer if wanted.    If the purchaser assumes the debt, I would like to have the one-fourth down; if I have to pay it off, I should like the one-third, and the balance to suit purchaser, at six per cent. per annum payable every six months.    That is what I would like to have, but will vary."

July 23, 1901, W. T. Ross wrote the appellee saying: "I have several offers for the farm, the best of which I

will herewith submit to you.   The party will pay $36,000 for it, assume the mortgage and pay you $10,000 March 1, 1902, at which time possession is to be given.   He also asks an option to pay a part or all of deferred payments at any interest anniversary inside of five years.   Interest payable annually.   Benj. Wetle, James Loman, Mr. Strong, and several others have looked at it, and $75 per acre is the best I have been offered till I received this one. Ben Wetle offered me that.   Let me hear from you just as soon as you get this, and if agreeable, my father and I will go over and close him up."   The same day W. T. Ross wrote the appellee by postal card as follows:   "I wrote you a letter thas a. m. concerning sale of land.   The greatest kick my clients have on the place is the run down condition of improvements and the morning-glory vines. The buildings are in a very dilapidated condition, and there is practically no fences.   I write this to show you why it has not been sold before.   I am holding the price stiff."   Replying to this letter and the postal card, the appellee wrote to W. T. Ross, July 13, 1901, saying:   "In regard to the offer you got I have had my mind made up that I would not take any less for my farm than what I put it at; but if he will make it $36,500 and make the first payment on February 1, 1902, you can call it a trade.   I have been offered very near that figure from a man at Watseka, but I would not take it, as I thought that the place was worth all that I asked for it.   Your statement was $36,000 for the place, and the purchaser assumes the mortgage and pay $10,000 down and the balance within five years."

August 8, 1901, W. T. Ross wrote the appellee by postal card, saying:   "I sold your farm to Mr. Strong.   $36,800. Will send you copy contract in a day or two."   W. T. Ross also wrote the appellee August 19, 1901, saying:   "Enclosed please find contract with Mr. Strong on sale of

land. He thinks you ought to cut his interest down to five per cent., but I told him I could not do it. Have you an abstract of title? It will save getting a new one. I have some parties at Kentland who wanted the farm and made the offer I sent you, but I did not take the proposition out of my pocket (the one you sent me). The first mortgage comes due February 1, 1902, but he could not get his money until March 1, so I showed him he could let it lapse for thirty days without any trouble, or could get the extension for that period. You have your wife sign the contract and return to me and I will have all papers properly fixed up and return contract to you." The instrument transmitted with this letter was the alleged contract on which the complaint was based.

August 31, 1901, the appellee wrote to W. T. Ross, saying: "Your letter and contract came to hand, and contents noted. There was something in it that I thought was not right, and I wanted to have my attorney see it, but this is the time of year that people here take their outing at beach, and I have not seen him yet, but expect to see him this incoming week, and if all right will have it signed and sent to you. If not right, I will have one drawn up and sent you."

October 2, 1901, W. T. Ross wrote two postal cards to the appellee, saying in the first: "Your letter and contract came to hand while I was in Iowa, hence my delay in answering. Mr. Strong will not sign any such contract. He will not pay the mortgage till he gets possession. Also he will not give grain rent indicated by said contract (one-half of grain and hay delivered in Raub). I signed the first contract as your agent, and got more than you asked. You better send the old contract back." In the second card he said: "After writing you this a. m., I thought I had better explain definitely. You told me in your letter to take $36,500, and get the best contract I could, which I did. Mr. Strong and Dodson Bros., of Kent, would not

touch it till March 1, 1902, as their money was tied up till that time. Mr. Strong was to give one-half rent if the place was fixed up and a new barn erected. My father told him so, and Mr. Strong has his $1,000 deposited in our bank. He paid it when he signed the contract." The letter and contract mentioned in the first of these postal cards as having come to hand some time before the date of the card were not in evidence.

There was introduced in evidence also a letter from the appellee to W. T. Ross, dated October 11, 1901, in answer to these two postal cards, in which the appellee stated certain matters which he thought ought to be specified in the contract, and which it did not mention, and asking William, if these proposals were satisfactory, to get a contract made out. Also there were in evidence letters of W. T. Ross to the appellee dated November 10, 1901, and December 2, 1901, from which it appears that the correspondents discussed the subject, carrying on a controversy with each other in relation to the contract, but not showing acquiescence by the appellee in what had been done. There was also a letter from W. T. Ross of December 4, 1901, to the appellant, in which the writer stated, among many other things: "I sent him the contract you and I entered into, and he refuses to send that back. I will stand by you on our contract, as I have full commission from him to do as I have done." In answer to this letter the appellant wrote W. T. Ross, making certain proposals as to the manner of performance on his part. These letters, which we do not set out, were most of them quite lengthy, and we can see no sufficient reason for taking space to set them forth, or making further reference to them. Instead of an agreement between the parties they showed want of agreement.

It appeared in evidence that the alleged contract in suit was signed in duplicate, and that one of the duplicates was sent to the appellee, as above indicated, while the other

was taken by the appellant. There was evidence of some difference in the language of the duplicates, the one retained by the appellant containing the words "or more" after the words "to pay $10,000." There was testimony to the effect that the appellant thought his duplicate was lost, in August or September, 1901, and wrote to W. T. Ross that it was lost, and asked him to get his uncle to send a copy of the contract, and that W. T. Ross wrote in answer in a letter of a few lines that his uncle refused to send a copy back. There was evidence to the effect that the sum of $1,000, paid by the appellant to W. T. Ross, at the time of the signing of the contract, was deposited in bank by the latter, who, by the agreement between him and the appellant, was to hold it until the appellant should receive an abstract of the title, and then it was to be sent to the appellee, and that this money was still in the possession of W. T. Ross. It does not appear in the evidence that the appellee had any information that the contract had been signed in duplicate, and that one of the duplicates was given to or retained by the appellant, or that the instrument sent to the appellee was not the only written instrument purporting to be a contract of sale, or that there was in existence any copy thereof.

Upon the whole evidence, too lengthy to be here set forth, we think it is a reasonable inference that the appellant knew at the time of the transaction with W. T. Ross that he was to send the duplicate retained by him to the appellee for complete execution and return; and within a time not unreasonably long, considering the distance between the parties, and the fact that all communication with the appellee, as well as some, at least, of the communication between the appellant and W. T. Ross, was by post, the appellant was apprised of the dissatisfaction of the appellee, shown in part by his letter of August 13, 1901, the date at which ratification was alleged in the reply; and by the failure of the appellee to return the contract

as expected by the appellant, and by the various counter propositions between the parties, W. T. Ross and the appellant failed to obtain notice of acceptance, and had repeated notice of the rejection of the contract as signed. The evidence, indeed, showed, as alleged in the complaint, as it was before amended, that "soon after the execution of the contract the appellee repudiated it," and it failed to show that he "still retains to his own use and benefit said sum of $1,000."

We need not, for the purposes of this case, determine whether or not authority binding upon the owner of land to contract on his behalf for the sale thereof may be conferred by him upon the agent without a formal power of attorney, or may be granted by letters sent through the post. And, if such authority may be so conferred by such writing not under seal, we need not determine whether or not the appellee, by the correspondence between him and the agent, conferred on the latter authority to execute on behalf of the appellee a binding contract of sale, or only authorized him to find a purchaser. For, assuming that authority was granted to make a contract of sale on behalf of the appellee, the differences between the terms of the contract signed by the agent and the terms which appellee offered to accept are numerous, and material and manifest upon a casual comparison of the alleged contract with the correspondence between the appellee and the agent. The agency was special, and the agent could not bind the appellee by terms beyond or differing materially from those authorized.

The agent could not bind the appellee by any act not reasonably necessary for carrying into effect the authority expressly conferred. The appellee had no direct correspondence with the appellant after the latter rejected the offer of the former to sell for $40,000. The appellant negotiated with the agent alone, and had sufficient notice that the authority of the latter was in the correspondence

between the appellee and the agent. And the appellant was bound to ascertain the extent of the agent's authority, and had easy means of doing so by calling for and reading the correspondence. He must be regarded as bound by the restrictions therein. We are constrained to conclude that the act of the agent was in excess of his authority, and not binding upon the appellee unless ratified by him.

We can not find from the evidence that the appellee at any time, with full knowledge of all the facts, ratified the contract. He had no information that a duplicate was in possession of the appellant, or that any paper had been signed except the one sent to him, which he was asked to have signed by his wife, and which he was requested to return. He might reasonably suppose, under the circumstances, with the knowledge of which the appellant must be regarded as chargeable under the evidence, that his retention of the contract would indicate his disapproval thereof. But besides, being apparently desirous of consummating a sale of his land, he, within a reasonable time, commenced and for a considerable period continued to write counter proposals to the agent, whose answers indicated the rejection of such proposals by the appellant. The appellee had reason to believe that the agent and the appellant were in communication with each other concerning the return of the contract, and in relation to the appellee's objections thereto and his proposals for further negotiations, and under all the circumstances the silence as between him and the appellant personally could not operate as an adoption of the contract. When, according to the testimony of the appellant, in the same month in which the contract was signed or the next month, he wished to obtain a copy of the contract, he did not apply directly to the appellee, but requested the agent to do so, and as a response was informed of the refusal of the appellee. Under the circumstances of the case, the appellant had no reason to expect any communication directly from the appellee.

Upon the well-settled and familiar doctrines of the law of agency, we can not determine that the trial court erred in the refusal of a new trial.

Judgment affirmed.